2003 VT 70

**MacDonough-Webster Lodge No. 26, Free and Accepted Masons
v. Michael and Laurie Wells and Mark and Tammy Denison**

[834 A.2d 25]

No. 02-103

Present: Amestoy, C.J., Dooley, Morse,[1] Johnson and Skoglund, JJ.

Opinion Filed August 1, 2003

---

[1] Justice Morse was present when the case was submitted on the briefs but did not participate in this decision.

*George T. Faris, IV* of *Law Offices of George Faris, IV,* Shelburne, for Plaintiff-Appellant.

*Robert J. Perry* of *Perry, Schmucker & Goldsborough,* South Burlington, for Defendants-Appellees.

¶ 1. **Johnson, J.** This dispute arises out of competing claims to ownership of land at the boundaries of a parcel owned and occupied by plaintiff MacDonough-Webster Lodge No. 26, Free and Accepted Masons. The Masons appeal both the trial court's grant of partial summary judgment on the issue of whether the lodge property qualifies for the charitable use exception to Vermont's adverse possession statute and the trial court's decisions on the merits finding that the Masons' neighbors, the Wells and the Denisons, had acquired certain strips of land located at the boundary of the Masons' property through adverse possession. We affirm in part and reverse in part.

¶ 2. The Masons brought a trespass action asking the court for a declaratory judgment fixing the boundaries of their property to stop certain uses by their neighbors. Their neighbors filed counterclaims contending that they have acquired title to some of the Masons' land by adverse possession. The Masons moved for partial summary judgment, arguing that 12 V.S.A. § 462, which exempts lands held "for a public, pious or charitable use" from claims of adverse possession, applied and shielded the Masons' property against their neighbors'

claims. The neighbors also filed motions for partial summary judgment. The lower court found that § 462 was not triggered by the Masons' use of the lodge property, and granted partial summary judgment to the neighbors. Following a hearing on the merits, the trial court held that the Masons' neighbors had established, through adverse possession, title over several strips of land at the boundaries of their property and acquired a prescriptive easement for the use of the Masons' driveway.

## I. The Exemption for "public, pious, or charitable use"

¶ 3. We begin by considering the threshold issue of the application of the charitable use exception to the Masons. We review the Masons' appeal from the superior court's grant of partial summary judgment de novo. Summary judgment is granted only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Bacon v. Lascelles*, 165 Vt. 214, 218, 678 A.2d 902, 905 (1996). "[T]he nonmoving party is to be given the benefit of all reasonable doubts and inferences." *Murray v. White*, 155 Vt. 621, 628, 587 A.2d 975, 979 (1991). We agree with the trial court that 12 V.S.A. § 462 does not protect the Masons' property from adverse possession claims, but we apply a slightly different rationale.

¶ 4. In rendering its decision on the cross-motions for summary judgment, the lower court relied on our holding in *Jarvis v. Gillespie*, 155 Vt. 633, 641-44, 587 A.2d 981, 987-88 (1991). In *Jarvis*, we considered whether 12 V.S.A. § 462 automatically applies to any parcel of land owned by a municipality, no matter whether the land was open for a public use. We held that under some circumstances a fact finder could determine that a municipal property is not "given to a public use" and, in such case, the land would not be exempt by § 462 from a claim of adverse possession. *Id.* at 642-43, 587 A.2d at 987-88. Following *Jarvis*, the legal question as framed by the trial court in the case at bar became whether the Masons' primary use of their property benefitted the public, such that the land could be considered "given to a public use" in the *Jarvis* sense. On the facts alleged by the Masons, the lower court found that although the Masons use their property for some charitable uses, the principal use of the Masons' property is to benefit Lodge members, leaving the Masons subject to adverse possession claims.

¶ 5. We agree with the trial court's conclusion, but because the rules we enunciated in *Jarvis* applied to publicly owned property while the Masons' claim lies under the "charitable use" exception in 12

V.S.A. § 462, we clarify the relationship between public and charitable uses based on our interpretation of the statute and its legislative history. Section 462 exempts properties "given, granted, sequestered or appropriated to a public, pious or charitable use, or to lands belonging to the state" from Vermont's fifteen-year statute of limitations on ejectment actions, established by 12 V.S.A. § 501. This Court has interpreted the language of § 462 in the context of pious uses and public lands. See *Chittenden v. Waterbury Ctr. Cmty. Church*, 168 Vt. 478, 485-88, 720 A.2d 20, 25-27 (1998) (upholding "pious use" provision against an establishment clause challenge); *In re .88 Acres*, 165 Vt. 17, 19-20, 676 A.2d 778, 780 (1996) (applying § 462 to property dedicated to use for a town school); *Jarvis*, 155 Vt. at 642, 587 A.2d at 987 (applying § 462 to municipal lands); *Davis v. Union Meeting House Soc'y*, 93 Vt. 520, 526, 108 A. 704, 707 (1920) (holding that predecessor statute to § 462 exempts lands held for pious use from susceptibility to adverse possession claims); *Hazen v. Perkins*, 92 Vt. 414, 420, 105 A. 249, 251 (1918) (applying predecessor statute to § 462 to public waterways). Application of § 462's "charitable use" language, however, presents a question of first impression.

¶ 6. When construing a statute, our obligation is to identify and implement the intent of the Legislature. *Brennan v. Town of Colchester*, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999). In cases where the meaning of the statute is clear and unambiguous, we apply the plain meaning of the statute. *DJ Painting, Inc. v. Baraw Enters.*, 172 Vt. 239, 247, 776 A.2d 413, 420 (2001). In cases where the plain meaning of the words is not obvious, we look to the "whole of the statute and every part of it, its subject matter, the effect and consequences, and the reason and spirit of the law." *Sagar v. Warren Selectboard*, 170 Vt. 167, 171, 744 A.2d 422, 426 (1999) (internal quotations omitted). We favor interpretations of statutes that further fair, rational consequences. See *Braun v. Bd. of Dental Exam'rs*, 167 Vt. 110, 117, 702 A.2d 124, 128 (1997) (statutes construed with presumption "that the Legislature does not intend an interpretation that would lead to absurd or irrational consequences"). In circumstances where the purpose and significance of a statute are unclear, we look to the statute's legislative history to "shed light" on its meaning. *Sagar*, 170 Vt. at 172, 744 A.2d at 426; see also *Brigham v. State*, 166 Vt. 246, 257-65, 692 A.2d 384, 391-95 (1997) (reviewing the "specific historical and legal origins" of the right to education in Vermont).

¶ 7. Section 462 dates back to the so-called quieting act of 1785, passed to address the widespread problem of defective land titles held

by early Vermont settlers. 3 *Records of the Governor and Council of the State of Vermont* 341 (E. Walton ed., 1875) (hereinafter 3 *Records of the Governor and Council*). The act set up a remedy whereby those with legal title had to pay for the land improvements made by ejected settlers. See "An Act for Settling Disputes Respecting Landed Property," June 17, 1785, *reprinted in* 14 *State Papers of Vermont* 17-20 (J.A. Williams ed., 1966) (hereinafter 14 *State Papers*).

¶ 8. We have not been able to identify any records discussing why the legislature of 1785 chose to include the following exception to the rules for the resolution of conflicting land claims: "[p]rovided always . . . that this act shall not extend to any persons settled on Lands granted or sequestered for public, pious, or charitable uses." *Id.* at 20. This exemption clause survives today in 12 V.S.A. § 462. The Vermont formulation is a variation on the traditional common law rule that protects public landowners at all governmental levels against adverse possession claims. See *In re .88 Acres*, 165 Vt. at 19-20, 676 A.2d at 780 ("Section 462 . . . is Vermont's version of the generally accepted, common-law rule that a claim of title or right by adverse possession does not lie against public lands. The principal policy consideration behind this rule is that it would be injurious to the public to allow adverse possession of lands dedicated to public use.") (citations omitted); 16 R. Powell, Powell on Real Property § 91.11[1]-[2], at 91-78 to 91-83 (M. Wolf ed. 2001) (providing an overview of the common law prohibition on adverse possession against governmental entities). This case requires us to examine the relationship between the traditional common law "public use" exemption and § 462's "charitable use" clause.

¶ 9. An 1866 Missouri law adopted the "public, pious, and charitable" language from Vermont's quieting act. See *Dudley v. Clark*, 164 S.W. 608, 612 (Mo. 1914) (noting that the statutory language came from Vermont's law). The Missouri version provides that "[n]othing contained in any statute of limitations shall extend to any lands given, granted, sequestered or appropriated to any public, pious or charitable use, or to any lands belonging to this state." Mo. Rev. Stat. § 516.090 (2002). Because of the parallel language, the Court may properly consider the Missouri court's construction of the statute. See *State v. Weller*, 152 Vt. 8, 13, 563 A.2d 1318, 1321 (1989) ("Where there are similar statutes in other states, we look for guidance in the interpretations of those statutes.").

¶ 10. We find the Missouri Supreme Court's explanation of the policy behind their version of the law particularly persuasive. In *Dudley v. Clark*, the court noted:

> Prior to [the enactment of § 516.090,] this state had, through its statutes, adopted the public policy of allowing the limitations to run against the state and municipalities. It was found to be a ruinous public policy, for under it school lands, roads, parks, streets, etc., were lost to the state and public through the laches or ignorance of the public or of officials representing it. Is it not learned at the fireside that what is everybody's business is nobody's business?

164 S.W. at 612. Missouri courts have echoed this reasoning in contemporary cases. See *Empire Dist. Elec. Co. v. Gaar*, 26 S.W.3d 370, 376 (Mo. Ct. App. 2000) ("[T]he rationale behind the enactment of § 516.090 was to protect against the loss of public lands due to the carelessness or oversight of the people charged with protecting the public's interests."); *Reardon v. Newell*, 77 S.W.3d 758, 763 (Mo. Ct. App. 2002) (citing *Empire* for same proposition). While these cases did not specifically invoke the "charitable use" provision of the law, we think that Missouri case law places an appropriate emphasis on the principle that the "public, pious, and charitable use" exception is designed to protect land that has been dedicated for the benefit of an indefinite segment of the public. Land qualifying for the exception lacks the protection of a discrete individual or group's long term interest in guarding the property against encroachments.

¶ 11. Given this emphasis on ensuring that adverse possession law does not infringe upon public benefit, the case law developed to effectuate the property tax exemption for "public, pious, or charitable uses" provides a useful analytical framework for determining the appropriate application of § 462. Section 3802(4) of Title 32 provides an exemption from property taxes for "[r]eal and personal estate granted, sequestered or used for public, pious or charitable uses." The policies served by the two exemption laws are strikingly similar. Section 462 provides an exception from the typical application of adverse possession statutes where such laws would otherwise tend to undermine efforts to maintain property in public use. Similarly, the § 3802(4) exemption was designed for the "'support of schools and churches believed necessary for the encouragement of settlement in colonial . . . Vermont.'" *Am. Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 106-07, 557 A.2d 900, 902 (1989) (quoting

*Brattleboro Child Development, Inc. v. Town of Brattleboro*, 138 Vt. 402, 405, 416 A.2d 152, 154 (1980)); see also *Broughton v. Town of Charlotte*, 134 Vt. 270, 272-73, 356 A.2d 520, 522 (1976) (discussing the policy behind § 3802(4)). Both laws encourage public uses by preventing the normal action of property law from interfering with property uses that benefit a wide spectrum of citizens.[2]

¶ 12. Legislative history provides additional support for our decision to harmonize our interpretation of § 462's charitable use exemption from adverse possession with § 3802(4)'s charitable use exemption from taxation. The Legislature originally enacted provisions providing tax and adverse possession exemptions for "public" lands on the same day: June 17, 1785.[3] The quieting act dealing with adverse

---

[2] This emphasis on the "public benefit" aspect of the charitable use exception can also be derived applying the canon of construction "noscitur a sociis," meaning roughly, "it is known by its associates," to the phrase "public, pious, and charitable." By this approach, our construction of the term charitable is colored by our understanding of the term public as used in § 462. See *Parks' Adm'r v. Am. Home Missionary Soc'y*, 62 Vt. 19, 25, 20 A. 107, 108 (1889) (explaining the application of noscitur a sociis as seeking "the meaning from the context and by the light of what precedes or follows"); see also *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000) ("'The maxim *noscitur a sociis*, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'") (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

[3] Presumably because of its highly controversial subject matter, the quieting act went through a series of enactments, repeals and reenactments in the pre-statehood era. See generally 3 *Records of the Governor and Council, supra*, at 341-56 (discussing the history of the quieting acts). The first version, passed October 27, 1781, which did not contain an exemption for "public" uses, was repealed by a February 1783 resolution prohibiting "Trials for Titles of Lands that have been possessed by virtue of any Conveyance for more than a term of five Years before the passing hereof." 3 *Records of the Governor and Council, supra*, at 344-45; "An Act to Enable Persons Who Have Entered And Made Improvements on Lands . . . , Oct. 27, 1781, *reprinted in* 13 *State Papers of Vermont* 67-68 (J.A. Williams ed., 1965); Journal of the General Assembly of the State of Vermont, February 27, 1783, *reprinted in* 3 *State Papers of Vermont* 180 (1925) (resolving to prohibit land trials). Betterment bills were taken up in both the February and October 1784 sessions but failed to pass each time. 3 *Records of the Governor and Council, supra*, at 345-49. The proposed October 1784 bill, which was published, along with a preamble explaining its purpose, in Vermont newspapers, appears to have contained the first instance of an exception for public, pious, or charitable uses. See *Vermont Gazette*, Dec. 6, 1784, at 5. However, the *enacted* version of the law including that language passed on June 17, 1785. "An Act for Settling Disputes Respecting Landed Property," June 17, 1785, *reprinted in* 14 *State Papers, supra*, at 17, 20. After the June 1785 Act was published in Vermont newspapers, the Legislature reenacted it with minor changes — probably in response to their failure to submit the act to the people before its original enactment in June of that year. "An Act for Settling

possession has already been discussed at ¶ 7 above. The state's first law exempting public lands from property taxation, the antecedent to § 3802(4), was titled "An Act Prohibiting the Taxing [of] Public Lands." See 14 *State Papers*, *supra*, at 14-15. The law stated that "all Lands granted for public or pious uses as well as public grants within this State, while remaining for such use or uses shall be (and are hereby declared) free from taxation of every kind whatever . . . ." *Id.* In 1787, the Legislature incorporated the same "public, pious, or charitable" language used in the quieting act into the tax exemption statute, where it is currently codified in § 3802(4).[4] The overlapping language, date of passage, and policy concerns, taken together, provide convincing evidence that the Legislature intended the two exemptions from the typical legal treatment of property, one for taxation and one for adverse possession, to accomplish similar purposes. In determining what test we will use for the "charitable use" exception contained in § 462, we will therefore look to the tests we have developed for determining whether an entity qualifies for the "charitable use" exemption from property tax liability.

¶ 13. To qualify for tax exemption under § 3802(4), a property must meet the three criteria laid out in *Am. Museum of Fly Fishing*, 151 Vt. at 110, 557 A.2d at 904. First "the property must be dedicated unconditionally to public use." *Id.* Second, "the primary use must directly benefit an *indefinite* class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served." *Id.* (emphasis added). Third, "the property must be owned and operated on a not-for-profit basis." *Id.*

¶ 14. Without reaching the other two requirements, we hold that the Masons' property fails to meet the second criterion. Even when viewed under the summary judgment standard—supplying all reasonable inferences in favor of the nonmoving party—the facts

---

Dispute Respecting Landed Property," Oct. 27, 1785, *reprinted in* 14 *State Papers*, *supra*, at 64-67.

[4] Compare "An Act Prohibiting the Taxing [of] Public Lands," June 17, 1785, *reprinted in* 14 *State Papers*, *supra*, at 14-15 (without language matching that of § 3802(4)), with "An Act Directing the Listers in their Office and Duty," Oct. 26, 1787, *reprinted in* 14 *State Papers*, *supra*, at 380, 383-84 (incorporating the same "public, pious, or charitable" language as the current law). Interestingly, a March 1787 act repealed virtually all of the laws passed between 1779 and 1786 except for a token few. Among the laws kept in force were the quieting act and the law exempting public lands from taxation. See "An Act to Repeal the Several Statutes Therein Mentioned or Described," Mar. 10, 1787, *reprinted in* 14 *State Papers*, *supra*, at 337-39.

alleged by the Masons fail to establish that the primary use of the Lodge property benefits an *indefinite* class of persons. According to their responses to interrogatories included in the record, the Masons are a fraternal organization. Their mission is to "make good men better citizens, parents, moral people, and generally improve them." The Lodge building is used by the Masons and Eastern Star (the women's counterpart to the Masons) for events such as meetings, lectures, rituals, and dinners. It is regularly used only by those two groups, approximately once a month. Nonmembers are not allowed at regular meetings, but do attend educational meetings, as well as some dinners and other events.

¶ 15. At some monthly meetings, Lodge members vote on monetary or in-kind donations to people in need, or to charities. Although the Lodge does not keep a record of its charitable activities, their answers to interrogatories mentioned some recent charitable involvement: in-kind contribution of items for sale at a flea market, with proceeds to the Jericho Food Shelf; a spaghetti dinner, with proceeds to benefit a person in need; cooking and serving lunch at the Jericho's annual town meeting; and helping care for the town cemetery.

■ ¶ 16. The primary use of the Lodge property is to benefit the Masons—a distinctly *definite* class of persons. No evidence in the record suggests that the Lodge was at any time used primarily for a charitable purpose.[5] The property is used for the Masons' monthly meetings aimed at the moral improvement of the membership. Although a portion of these meetings is devoted to planning a program of charitable actions, and the Masons' charitable activities are admirable, the primary use of the Lodge property for private meetings of a fraternal club cannot be found to benefit an indefinite segment of the public at large, and thus the Lodge property cannot qualify for an exemption from adverse possession under § 462. In so holding, we recognize and effectuate "the rule that exemption statutes are to be construed most strongly against those claiming the benefits." *Trs. of*

---

[5] Because we find nothing in the record that shows that the Lodge has ever been used primarily for a charitable purpose, we need not consider whether § 462 would apply if the Lodge were being used primarily for a charitable purpose at the time this litigation commenced but had not been so used for fifteen years before the litigation, or had been used in a manner that would meet the charitable use standard at some time within the fifteen year period claimed as prescriptive but was not in such charitable use at the time the litigation commenced.

*Vt. Wild Land Found. v. Town of Pittsford*, 137 Vt. 439, 444, 407 A.2d 174, 177 (1979).

## II. Adverse Possession Claims

¶ 17. Having decided that the Masons' property is subject to the normal operation of Vermont's law on adverse possession, we turn to the trial court's decision finding that the Masons' neighbors had acquired rights to portions of the Masons' property. Adverse possession is a mixed question of law and fact. *N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 438, 736 A.2d 780, 782 (1999), *cert. denied*, 528 U.S. 1079 (2000). This Court views factual findings of the trial court in the light most favorable to the prevailing party below and will not set aside the findings unless they are clearly erroneous. *Id.*; *Brown v. Whitcomb*, 150 Vt. 106, 109, 550 A.2d 1, 3 (1988). Our review of conclusions of law is, in contrast, nondeferential and plenary. See *State v. Madison*, 163 Vt. 360, 371, 658 A.2d 536, 543 (1995) ("review de novo" commonly used to describe nondeferential on-the-record standard of review appellate courts apply to lower court determinations regarding questions of law or mixed questions of law and fact).

¶ 18. We begin our discussion with an overview of the disputed land holdings. The Masons' property lies on the southern side of Vermont Route 15 in the Town of Jericho. Defendants Michael and Laurie Wells own the adjacent parcel to the east of the Masons. Defendants Mark and Tammy Denison own the adjacent parcel west of the Masons. The parcels owned by the Masons and the Denisons were at one time owned by the Vermont Baptist Convention. The Masons' lodge structure and parcel served as a church while the Denisons' house served as a church parsonage.

¶ 19. The Masons' property includes a U-shaped driveway that loops around their lodge, passing by the Denisons' parcel on the west side and the Wells' property on the east. Because of its shape, the driveway has two entrances to Route 15, one to the east of the Lodge and one to the west. The deeds to both the Mason and Denison properties include an easement allowing the Denisons to use the western side of the driveway for ingress and egress. The Denisons, however, like their predecessors in interest, the Browns, almost always used the east exit from the driveway because a hill and curve in Route 15 are so close to the western exit that it is dangerous for drivers to pull out onto the highway from the west end. The Browns

were never given, and never asked for, permission to use the Masons' eastern driveway.

¶ 20. For years the Masons and their neighbors coexisted amicably. Unfortunately property disputes arose shortly after the Denisons purchased the property. Within a few weeks after the Denisons assumed ownership, various conflicts arose over their use of property claimed by the Masons. When neighborly discussions failed to resolve the disputes, the Masons procured the services of surveyor Warren Robenstien. Robenstien's survey revealed a number of encroachments onto the Masons' land. The Denisons' barn overlapped the Masons' southern boundary by approximately five feet. The Denisons' stone wall and flower bed encroached upon the western edge of Masons' property. The Robenstien survey also determined that the Wells' barn and fence protruded onto the eastern edge of the Masons' lot.

¶ 21. The Masons filed a trespass suit against both neighbors. They sought declaratory relief as to the property boundaries as well as the existence of easements across their eastern driveway. The Denisons and Wells counterclaimed for adverse possession of the disputed land and for prescriptive easements for the use of the eastern driveway. They hired a different surveyor, Mark Ward, and his survey revealed slightly different property lines. For purposes of this appeal, the place where Ward's survey differed materially from the Robenstien survey was the eastern edge of the Mason property, which Robenstien placed farther east than Ward. The Robenstien survey had shown that the Wells' barn on the east encroached slightly on the Masons' land, and that a fence between the Wells' and Masons' properties actually ran on the Mason property; the Ward survey depicted the property line such that the fence and the barn were located on the Wells' property. The trial court found that the Ward survey "accurately and correctly depicts the boundaries of the Wells lot."

¶ 22. The Masons' first assignment of error is that the trial court ignored Robenstien's survey and made no findings of fact to support its conclusion of law designating Ward's survey as correct. Because the discrepancies between the two surveys presented a question of fact requiring the court to weigh the credibility of two expert witnesses, our standard of review is to determine whether the court's finding of fact is supported by the record and whether those findings reasonably support its conclusions. *Omega Optical, Inc. v. Chroma Tech. Corp.*, 174 Vt. 10, 18, 800 A.2d 1064, 1069-70 (2002). As we have held:

> When evidence conflicts, the credibility of witnesses, the weight and sufficiency of evidence, and its persuasive effect

are matters accorded to the exclusive determination of the trier of fact. If the record contains any credible evidence that fairly and reasonably supports the findings, the trial court's ruling must stand even though inconsistencies or substantial evidence to the contrary may exist.

*Lawrence v. Pelletier*, 154 Vt. 29, 33, 572 A.2d 936, 939 (1990) (citations omitted). During trial on this matter, Ward testified extensively about the basis for his survey and the reasons that he believed his results were accurate. We conclude that there is ample evidence in the record to support the trial court's finding that the Ward survey accurately depicts the boundary between the Wells' and the Masons' respective properties, despite Robenstien's conflicting testimony.

¶ 23. The Masons' second assignment of error concerns a fifteen foot strip awarded to the Denisons along the southern boundary of the Masons' property. The court awarded this land to the Denisons on the basis that the Denisons' barn encroached on the Mason property by five feet, and that the Browns, the Denisons' predecessors, had used the area in front of the barn for parking and thus acquired title through adverse possession.

¶ 24. The trial court correctly stated the relevant law on adverse possession: "[t]o achieve title through adverse possession, a claimant must demonstrate that possession of the land was open, notorious, hostile and continuous throughout the statutory period of fifteen years." *Pafundi*, 169 Vt. at 440, 736 A.2d at 784. The Masons contend that the trial court's finding of fact that the Browns' use of the parking area had been continuous overlooked the fact that the Masons had also continually used the property. The Masons emphasize uncontradicted testimony showing that the Masons had always used the fifteen foot strip at the southern edge of their property for parking during their meetings, including testimony to this effect from Mark Denison. The Masons argue that their regular usage interrupted the Browns' use of the parking area and rendered the trial court's finding that the Browns' use was continuous erroneous. We agree. "It is presumed that the use of land by one who has record title is the exercise of his right to enjoy it, and such use interrupts the continuity of adverse possession by another." *Harlow v. Miller*, 147 Vt. 480, 483, 520 A.2d 995, 998 (1986); see also *Rueda v. Kuban*, 133 Vt. 584, 586, 349 A.2d 907, 908 (1975) ("[U]se by the record owner during the period . . . interrupts the continuity of possession necessary . . . ."). A person can gain title by adverse possession even without the intention of taking

land not belonging to him "so long as he does intend to exclude all others." *Ganje v. Schuler*, 659 N.W.2d 261, 266 (Minn. Ct. App. 2003) (internal citation and quotation omitted). The trial court's failure to take into account uncontroverted evidence showing that the Masons had used the parking area was clearly erroneous. This is not a case where the Denisons have planted their flag on the land and left it unfurled, without retreating in their claim to it. See *Pafundi*, 169 Vt. at 444, 736 A.2d at 787; *Barrell v. Renehan*, 114 Vt. 23, 29, 39 A.2d 330, 333 (1944) (claimant must "unfurl his flag on the land, and keep it flying" to give the owner notice of occupancy). We find that viewing the evidence in the light most favorable to the Denisons, who prevailed below, we cannot uphold the trial court's decision granting the Denisons' title to the fifteen foot parking area in front of the barn. There is no evidence challenging the Masons' regular use of the parking area. The statutory period for adverse possession for this parcel has not begun because the Masons have continuously used the land in question. The trial court's holding that the Denisons have acquired title to the five foot encroachment made by their barn into the Masons' property is upheld, but its determination that the Denisons had also obtained title to the remaining portion of the parking strip is reversed.

¶ 25. The Masons' third assignment of error concerns a strip of land on the western side of the Masons' property that the trial court found had been acquired through adverse possession by the Denisons. In 1953 and 1954, the Browns built a stone wall along what they believed to be a portion of the eastern boundary of their property and installed a flower bed to the west of that wall. The wall was actually several feet inside the Masons' property. The Browns maintained the flower bed near the wall until the Denisons bought the property in 1998. In 1963, Gerald Brown became a Mason, and he performed routine maintenance on the Masons' grounds, including taking care of the Masons' lawn and planting numerous trees, until he sold the property to the Denisons in 1998. The trial court's order grants the Denisons title to not only the flower garden separated from the Masons' property by the stone wall, but extends the area acquired by the Denisons through adverse possession all the way up to Route 15, drawing a straight north-south axis from the stone wall to the end of the Denisons' property. Most of the area north of the wall included in the trial court's order consists of gravel driveway subject to an existing deeded easement to the Denisons' property.

¶ 26. The Masons contend that the trial court's findings of fact do not support its conclusion of law that this strip was obtained by the Denisons because there is no finding that the Browns' use of the strip was hostile to the Masons' claim of ownership, and therefore the Denisons have not proved an essential element of their claim for adverse possession of the strip. We agree and reverse, allowing the Masons to retain ownership of the entire western strip of the lodge property.

¶ 27. We discuss separately the northern portion of the strip, consisting mainly of the gravel driveway, and the southern portion of the strip, consisting of the flower bed behind a stone wall. The northern part of the strip is covered by an existing deeded easement to the Denisons' property allowing the Denisons to use the driveway to access the road. The trial court offers no explanation for its decision granting this strip to the Denisons, and we can find none. Any use the Denisons made of this strip would have been pursuant to their deeded easement. No use of this strip alleged by the Denisons was incompatible with the use of the strip by the record title holders, the Masons. "[I]f a claimant's use of the property is shown to be permissive, then he cannot acquire title by adverse possession." *Hovendick v. Ruby*, 10 P.3d 1119, 1122 (Wyo. 2000). Moreover, when possession has begun with permission of the true owner, "such possession cannot acquire the character of *adverse* possession until . . . there has been some subsequent act demonstrating open disavowal of the owner's title." 16 R. Powell, *supra*, § 91.05[5][a], at 91-30 (emphasis in original). We find no evidence in this record tending to show that the Denisons took any act regarding the northern part of the western strip that could be seen as disavowing the Masons' title.

¶ 28. The situation in the southern portion of the western strip, the part upon which the Browns had built a stone wall and tended a flower garden, is somewhat different, but again the trial court's conclusion that the Denisons established ownership of the strip through adverse possession is not supported by the trial court's findings. Before considering the issue of the flower garden, the trial court held that "defendants' claim to the entire lawn around the [Masons'] property cannot stand because the [Masons] ha[ve] shown that the Browns had permission to maintain the lawn." The trial court apparently distinguished the walled-off garden from the rest of the lawn on the basis that the Browns' act of building the wall was sufficient to put the Masons on notice of their claim to ownership of the

flower garden area. Marking a claim to land with a fence is an indication of an intent to possess which, if combined with other acts of possession, can establish the presumption that land is held adversely up to the fence. See *Pafundi*, 169 Vt. at 441-42, 736 A.2d at 785 (recognizing that marking claim to land with a fence has same effect as proceeding under color of title; that is, it "extends acts of possession on any part of the land to the boundary so marked"); *Hovendick*, 10 P.3d at 1123 (noting that occupation of land under the mistaken belief that a fence marks a boundary of the land establishes presumption of adverse possession but distinguishing a boundary fence from a fence of convenience and holding that a fence of convenience creates a permissive use that cannot change into adverse title). In this case evidence in the record rebuts the presumption of adverse possession. The court found that "[f]rom 1963 until 1998, Mr. Brown mowed the [Masons'] lawn and helped to maintain the grounds of the [Masons'] property." The Masons could easily have assumed that the maintenance of the garden area was simply part of Mr. Brown's work as groundskeeper. Under these circumstances, despite the existence of the stone wall, the evidence was not sufficient to establish the element of hostility required for an adverse possession claim to succeed.

¶ 29. The final issue on appeal is the trial court's grant of a prescriptive easement for use of the western part of the Masons' driveway. The trial court found that the Wells have acquired a prescriptive easement to use this part of the driveway for delivery vehicles that bring fuel oil and propane to their home, and that the Denisons have acquired a prescriptive easement giving them the right "to use the [Masons'] driveway for all types of vehicle traffic including, but not limited to, cars and trucks." The Masons do not appeal the part of the order granting a prescriptive easement to the Wells. They claim, however, that the trial court's findings were insufficient to award a prescriptive easement to the Denisons for all types of vehicles and that the Denisons' easement should be limited to personal passenger vehicles. We cannot agree with the Masons' characterization of the trial court's findings and affirm. The trial court found that the Browns used the driveway "for all types of vehicles including, but not limited to, cars, trucks, horse trailers, and hay wagons." This finding is adequately supported by the record. The Browns' usage satisfied the fifteen year period of prescription and is sufficient grounds for the trial court's award.

*The parts of the trial court's orders regarding the border between the Wells' and the Masons' properties and the Denisons' prescriptive easement over the western part of the Masons' driveway are affirmed. The parts of the trial court's order finding that the Denisons had acquired strips of land to the west and south of the Masons' property are reversed except that part of the trial court's order recognizing the Denisons' claim to the 5 foot strip of property to the south of the Masons upon which their barn is located. The Denisons should file amended copies of Exhibit 25 showing the boundaries of their property in accordance with this opinion.*

