Vermont Superior Court
Filed 02/06/25
Chittenden Unit

VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street
Burlington VT 05401
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 23-CV-04042

| Richard Tarrant v. Christopher Bartels et al |
|---|

## DECISION ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Richard Tarrant filed this suit, asserting trespass and seeking to quiet title in a strip of land over which he has record title but that has been used by his neighbors since 1979. Defendants Christopher and Amelia Bartels move for summary judgment on the basis that their predecessors obtained ownership of the strip through adverse possession and that they now own the disputed strip of land. The court grants the motion, with one minor caveat.

### Background

The material facts are undisputed. The parties' submissions establish that Mr. Tarrant owns lakeshore property on Mallets Head Road in Colchester that he acquired in 1968. The Bartels' predecessor-in-interest, John Gennari, bought property down the road in 1979; two undeveloped lots separated that property from Mr. Tarrant's. In or around 1988, Mr. Tarrant purchased the two lots to serve as a privacy buffer between his and Mr. Gennari's properties. The properties are bordered by Malletts Head Road to the east and by Lake Champlain to the west. Mr. Gennari and his wife, Emily, lived in the house on Mallets Head Road until 2019, when the Bartels (the Gennaris' daughter and son-in-law) purchased the property.

A survey commissioned by Mr. Tarrant in 2023 (Figure 1 below) depicts the parties' properties. The shaded area in Figure 1 represents the strip of land in dispute (the "Disputed Area"). The Disputed Area is about 39 feet from north to south on the lake side and about 28 feet from north to south on the road side. It covers less than 1/10th of an acre. The survey includes a "Monumentation Key" that explains that the numbers "(3)" and "(11)" refer to a 1-inch diameter galvanized iron pipe, and the number "(4)" refers to a 5/8-inch diameter iron pin that is flush to the ground.



Figure 1.

Mr. Gennari never had the property surveyed; it had a house and driveway on it in 1979, when he purchased it. There was a flat, paved turnaround area at the end of the driveway that extended into the Disputed Area. Throughout the time they owned the property, the Gennaris used the driveway and turnaround area as a parking area, a place to play basketball at a basketball hoop that was adjacent to the paved area, a place to hold parties, and, during some summers, a place to park an RV for their grandchildren when they came to visit.

When asked during a deposition how he determined the northern boundary of his property, Mr. Gennari testified that he found an iron pipe at the end of his driveway up on a hill that he assumed marked the northern boundary.

> Q: So when you owned that property -- when you purchased the property in 1979, what was your understanding of where the northern boundary line was of your property?

A: Well, off that pipe. And our driveway, paved driveway extended to just before that pipe, so it all made sense.

Q: So you went and found the iron monuments that were referenced in this exhibit?

A: Right. Actually looked up and saw it from the end of the driveway.

Q: And as you said, you confirmed that that boundary was past the end of your driveway, right?

A: Right.

Q: And can you estimate for me how many feet past the driveway you think that iron pipe is?

A: Maybe about five or six feet.

Q: So you understood at the time you bought the property in 1979 that your driveway was entirely on the property that you were purchasing?

A: I thought so.

When he bought his property, Mr. Gennari did not know who owned the property to the north: "[I]t was just the woods." Mr. Tarrant testified that he did not know until 2003 that the Gennaris' driveway extended onto property to which he held record title.

In addition to the driveway, an underground greywater field extends into the Disputed Area. In "the early 1980s," the Gennaris constructed a new greywater field in the Disputed Area, which required the removal of several trees that were replaced with grass. There was already a lawn on the northwest side of the property in 1979, when the Gennaris moved in. The Gennaris used the lawn to play croquet and other lawn games from the early 1980s until they sold the property to the Bartels and moved out in 2019. They reseeded it several times while they owned the property. In the mid-1980s, the Gennaris installed rock stairs and a perennial garden leading from the driveway parking area to the lawn. Figure 2 below reflects the Bartels' current use of the Disputed Area; the image includes the driveway, a rock garden, the greywater field, and the outline of the lawn in that area. The record establishes that this use is consistent with the historic use by the Gennaris from at least the mid-1980s until the time they sold the property to the Bartels.



Figure 2.

## Analysis

To establish title to property by adverse possession, " 'a claimant must show that use of the land was 'open, notorious, hostile and continuous throughout the statutory period of fifteen years.' "

*First Congregational Church of Enosburg v. Manley*, 2008 VT 9, ¶ 13, 183 Vt. 574 (quoting *MacDonough-Webster Lodge No. 26 v. Wells*, 2003 VT 70, ¶ 24, 175 Vt. 382); *see* 12 V.S.A. § 501 (fifteen-year statute of limitations for action for the recovery of lands). Here, Mr. Tarrant does not dispute that the Gennaris' use of the disputed area was continuous, for a period beginning no later than the early 1980s and continuing into this century—that is, for well over 15 years. Instead, he argues first that the Gennaris' use was permissive—and so not hostile—and alternatively, that their possession was not open and notorious. The undisputed facts, however, refute each of these arguments.

It is well-established that "[i]f a claimant's use of the property is shown to be permissive, then he cannot acquire title by adverse possession." *MacDonough-Webster Lodge No. 26*, 2003 VT 70, ¶ 27 (quotation omitted). Here, Mr. Tarrant makes much of the fact that when, in 2003, he first discovered that he actually held record title to the Disputed Area, he spoke with Mr. Gennari and told him he was free to use it. This, however, cannot retroactively make the Gennaris' use, for well over 15 years before then, permissive; that horse had long ago left the barn. *See Cmty. Feed Store, Inc. v. Ne. Culvert Corp.*, 151 Vt. 152, 161 (1989) ("Our law is clear that '[o]nce a grant is established by adverse use, the subsequent granting of permission will not serve to divest or defeat the claim.' ") (quoting *Moran v. Byrne*, 149 Vt. 353, 355 (1988)); *see also Zuanich v. Quero*, 135 Vt. 322, 325 (1977) (open and notorious use of property for fifteen years is *prima facie* claim of right, and once grant is established by adverse use, later grant of permission will not defeat the claim). And there is no evidence that before 2003, Mr. Tarrant even knew that he held title to the Disputed Area, much less that he gave permission for its use. Rather, the Gennaris' use during that period was clearly hostile—meaning simply that they used it without permission and under a claim of right. *See Hilliker v. Husband*, 132 Vt. 566, 568 (1974) ("In the absence of permission, the use of an established claim of right firmly establishes the hostility of that use."). Here it is undisputed that the Gennaris made use of the Disputed Area under a claim of right—the belief that they owned it. Whether they (and evidently Mr. Tarrant) were mistaken in that belief is irrelevant. *See Zuanich*, 135 Vt. at 325–26 ("The defendants are not precluded from establishing title by adverse possession by the fact that their use of the disputed property was premised upon the mistaken belief that the property was actually theirs.").

The suggestion that the Gennaris' use was not open and notorious fares no better. As Mr. Tarrant notes, "[a]cts of possession are deemed sufficiently open and notorious if they are conducted in a manner which would put a person of ordinary prudence on notice of the claim." *Jarvis v. Gillespie*, 155 Vt. 633, 641 (1991). "[T]he adverse possessor must unfurl his flag on the land, and keep it flying so that the owner may see, if he will, that an enemy has invaded his dominions and planted his

standard of conquest." *Moran*, 149 Vt. at 355 (quotation omitted). It is not necessary, however, "that the claimant verbally state to the owner that he has 'planted his standard of conquest.' Quite to the contrary, his 'use, or acts, may declare that they are done under a claim of right, as effectively as the words of the claimant.' " *Willey v. Hunter*, 57 Vt. 479, 490 (1884); *see also Spencer v. Jennings*, 95 Vt. 364, 369 (1921) ("[I]n order to perfect title by adverse possession, it is not necessary that the true owner should have actual knowledge or notice of the claim of the possessor. It is enough that the possession is open and notorious under claim of title, whether the true owner knew the fact or not.") (citations omitted).

Here, Mr. Tarrant blithely asserts that "[a]t bottom, a reasonably prudent owner would not be on notice of a claim, where the claim is based upon such a small encroachment, on a large lot used as a privacy buffer." Opp. to Defendants' Mot. for Summ. J., 7. He relies for this assertion on the unpublished entry order in *Pelletier v. Gosselin*, No. 2003-429, 2004 WL 5582089 (Vt. June 1, 2004); there the trial court had found that "defendants' driveway encroached on plaintiff's property to such a slight degree that its use could not be said to be open and notorious," and that defendants' tree-planting on plaintiff's property had been permissive. *Id.* at \*3. The "small encroachment" in this case however, consists of cutting trees to replace and then maintain a greywater field that spans the full width of one end of the Disputed Area, a driveway turnaround that spans more than half the width of the central portion of the Disputed Area, and maintenance and consistent use of a lawn and rock garden that occupy virtually the full width of the Disputed Area from just east of the lakeshore all the way to the driveway turnaround.[1] *See* Figure 2, *supra*. In short, far from making an encroachment "to such a slight degree that its use could not be said to be open and notorious," the Gennaris here occupied virtually the entire Disputed Area and used it as their own. Even giving Mr. Tarrant the benefit of all reasonable inferences, the conclusion is inescapable: the Gennaris unfurled their flag and kept it flying, over virtually the entire Disputed Area, for well over 15 years.[2]

Finally, Mr. Tarrant asserts that the Bartels are equitably estopped from asserting adverse possession. As he correctly notes, "[t]he doctrine of equitable estoppel precludes a party from asserting rights which otherwise may have existed as against another party who has in good faith changed his [or her] position in reliance upon earlier representations." *My Sister's Place v. City of Burlington*, 139 Vt.

---

[1] Ironically, Mr. Tarrant's own Amended Complaint undercuts his argument here. At paragraph 15, he asserts that his 2023 survey "confirmed that Defendants' turnaround extended well into lot 4 and . . . Defendants were using other areas of lot 4 for their own purposes."

[2] Indeed, Mr. Tarrant concedes that he believed the Gennaris had record title to this area from 1988, when he purchased the wooded lots, until 2003, and he has presented no evidence that he ever sought to occupy any part of this area.

602, 609 (1981). Here, the representation on which Mr. Tarrant relies is Mr. Gennari's written statement to Mr. Tarrant, shortly before he sold the property to the Bartels, that "[y]ou are in the catbird seat here, as wherever you say the border is will be the border." The flaw in this argument is obvious: there is no evidence that Mr. Tarrant in any way changed his position in reliance on this statement. Nor could there be; by the time Mr. Gennari made this statement, title in the Disputed Area had long since vested irrevocably in the Gennaris. In other words, Mr. Tarrant no longer had any rights in the property, and so cannot have acted or failed to act to his detriment with respect to the property.

On Mr. Tarrant's claim for declaratory relief, this leaves only the question of title to those portions of the Disputed Area that the Gennaris may not have occupied continuously for 15 years prior to Mr. Tarrant's supposed grant of permission in 2003. As shown on Figure 2, this was a relatively small proportion of the Disputed Area. The court need not trouble itself or the parties with delineating the precise extent of the Gennaris' use, however; the doctrine of constructive possession applies here to establish ownership over the entire Disputed Area.

> A claim of adverse possession that proceeds under bare claim of right extends only to that property which the claimant has actually occupied. A claimant may also, however, seek to prove ownership through constructive possession, the doctrine under which a claimant achieves possession of an entire plot of land through actual occupation of a part.

*N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 441 (1999) (citations omitted). "Vermont has long recognized two methods of achieving constructive possession: (1) when the claimant is operating under color of title and (2) when the land is marked by clear and definite boundaries." *Id.* (footnote omitted).

Here, both methods apply. As shown on Figures 1 and 2, the Disputed Area is clearly marked by the road on the east, the lake on the west, and the iron pipes marked "3" and "11" on the north. Moreover, as noted above, it is undisputed that the Gennaris made use of the Disputed Area under a claim of right; upon purchasing the property, Mr. Gennari located the two iron pipes, concluded that they delineated the northern boundary of the property, and thereafter acted consistent with that belief. Thus, the Gennaris clearly established constructive possession of the entire Disputed Area.

As noted in the opening paragraph above, Mr. Tarrant has also asserted claims for damages. This claim rests on the Bartels' continuing use of those portions of the Disputed Area that they and the Gennaris before them have actively used—the turnaround, greywater field, rock garden and path, and lawn—as well as what Mr. Tarrant claims was unlawful tree cutting. There is no evidence, however,

that any of these activities occurred beyond the boundaries of the Disputed Area.[3] Since the Gennaris had established ownership of the Disputed Area before 2003, at the very latest, there can be no argument that any activities anywhere in the Disputed Area constituted a trespass. This claim therefore also fails.

## ORDER

The court grants the motion for summary judgment. While Mr. Tarrant may be entitled to a declaration as to title, that declaration is not the one he seeks; rather, the court hereby declares that the Bartels have title, by adverse possession, to the entire Disputed Area, as demarcated by the pipes marked "3" and "11" on Figures 1 and 2. Whether that title extends beyond the Disputed Area to the sliver of lawn that extends beyond the northwest corner of the Disputed Area, as shown on Figure 2, must await further proceedings. The court further grants judgment to the Bartels on the trespass claims, to the extent those claims rest on any activities within the Disputed Area. Again, whether there has been a trespass by virtue of any activities on the sliver of lawn must await further proceedings. The clerk will schedule a status conference to discuss those proceedings.

Electronically signed pursuant to V.R.E.F. 9(d): 2/5/2025 11:15 AM

Samuel Hoar, Jr.
Superior Court Judge

---

[3] As shown on Figure 2, a small portion of the lawn on the northwest corner of the Disputed Area extends over the northerly line of the Disputed Area. As that lawn had been in existence when the Gennaris purchased their property and they appear to have used it continuously thereafter, the Bartels may not need the doctrine of constructive possession to support their claim to adverse possession of that sliver of lawn; that claim may be established by actual occupation and use. The parties' papers, however, do not sufficiently address the historical use of the sliver of lawn to allow the court to conclude, one way or the other, whether the Gennaris established ownership of that sliver by adverse possession. Rather, this question remains for further proceedings.