2008 VT 39

# State of Vermont v. Stephen Bryant

[950 A.2d 467]

No. 05-252

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 28, 2008

*William H. Sorrell*, Attorney General, and *John Treadwell*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*William A. Nelson*, Middlebury, for Defendant-Appellant.

¶ 1. **Skoglund, J.** The issue on this appeal from a conviction for cultivation of marijuana is whether the warrantless aerial scrutiny of defendant's yard, for the purpose of detecting criminal activity by the occupant of the property, violated privacy rights secured by the Vermont Constitution. We hold that Vermont citizens have a constitutional right to privacy that ascends into the airspace above their homes and property. The warrantless aerial surveillance in this case violated that constitutionally protected privacy right. Accordingly, we reverse.

¶ 2. Defendant was charged with felony possession and cultivation of marijuana. 18 V.S.A. § 4230(a)(3), (4). He moved to suppress from evidence the marijuana plants discovered growing by his house, alleging a violation of Chapter I, Article 11 of the Vermont Constitution. The trial court denied the motion. Defendant also sought to rely on a defense that he grew and used marijuana out of medical necessity to address his chronic pain. At trial, the court declined to treat the defendant's physician-witness as an expert and disallowed testimony about his experience with the medicinal use of marijuana. A jury convicted defendant on the cultivation charge, but not on the possession charge. Defendant appeals from the trial court's denial of his motion to suppress, and from its decision to exclude defendant's offered expert in the subject of the medicinal use of marijuana. We reverse on the first issue and decline to reach the second.

¶ 3. Defendant argues that an unconstitutional aerial surveillance of his property resulted in the issuance of a search warrant that led to the discovery of defendant's marijuana cultivation. At a hearing on the motion to dismiss, the following facts were found by the court or were uncontested. Defendant lives in a remote area on a wooded hill in the town of Goshen, in Addison County. The property is accessible by a locked gate on a Forest Service road to which only defendant, his partner, and the Forest Service have keys. Beyond the gate, the dirt road passes defendant's homestead and continues a short distance into the National Forest, where the road dead-ends. Where the road cuts across defendant's property, the Forest Service has a restricted right-of-way. Defendant has posted prominent no-trespassing signs around his property. Prior to the aerial surveillance, defendant told a local forest official that he did not want the Forest Service or anyone else trespassing on his land.

¶ 4. The local forest official suspected that defendant was responsible for marijuana plants that were reportedly growing in the National Forest (not on defendant's property) because he found defendant's insistence on privacy to be "paranoid." The forest official suggested to the State Police that a Marijuana Eradication Team (MERT) flight over defendant's property might be a good idea. MERT is an anti-drug program, and MERT flights are executed by the Vermont State Police in cooperation with the Army National Guard. A state trooper, scheduled to do a MERT flight, was given the information identifying the defend-

ant's residence as a good target. On August 7, 2003, the state trooper and an Army National Guard pilot flew in a National Guard helicopter to the Goshen area. Having previously located the site on a map, the trooper directed the pilot to defendant's property, where two plots of marijuana were observed growing about 100 feet from the house.

¶ 5. Defendant introduced testimony of several people who witnessed the flight. One witness, who was working outside at the time of the flyover, described the helicopter as being at twice the height of her house, or approximately 100 feet above ground level. She testified that the noise was "deafening." She observed the helicopter spend "a good half-hour" in the area of defendant's residence, where it circled "very low down to the trees." She believed that the helicopter was approximately 100 feet above defendant's property. When questioned about the altitude of the helicopter, she was certain that it was lower than 500 feet, and she was familiar with estimating such heights as a result of flying with her husband, who was a Navy pilot. She testified that she had seen helicopters in the area before, but that this one was different because "it was around so long and [was] so low and so loud." Another witness testified that the helicopter was ten to twenty feet above the treetops, and that the tallest trees were about sixty to sixty-five feet in height. He testified that the helicopter was so close that he "could hit it with a rock," and that he was certain that it was not 500 feet off the ground. The third witness was a member of the Vermont National Guard and generally familiar with helicopters. He observed the helicopter flying at about 120 feet, or at approximately twice the height of the trees. When he went outside, he felt the "concussion[-like]" feeling that is caused by air movement from a helicopter, and he could still feel the vibration when he returned inside the town offices in Goshen, where he was working. He testified that he saw the helicopter fly to the area of the defendant's property, about a mile away, where it remained for between forty-five minutes and an hour. He was certain that it never rose more than 200 feet above the ground. He noted that he had seen helicopters checking power lines in the Goshen area before, but that the altitude of this one was noticeable because the other helicopters did not fly as low.

¶ 6. After the flight, the state trooper prepared an application for a search warrant based solely on his observation during the aerial surveillance of what he believed to be marijuana plants. In the application, the trooper characterized the surveillance as having been from "an aircraft at least 500 feet above the ground." The warrant was issued and executed, and three marijuana plots were discovered by defendant's home.

¶ 7. Based on the evidence presented at the suppression hearing, the court found that the helicopter circled defendant's property for approximately fifteen to thirty minutes, well below 500 feet in altitude, and at times as low as 100 feet above the ground. Although both the trooper and the pilot testified that the helicopter remained at least 500 feet off the ground at all times, the court did not find their testimony to be credible. The court further found that pilots doing MERT flights in Vermont are told to stay at least 500 feet above the ground and that, according to a National Guard pilot who testified for the State, the reason MERT pilots are so directed is to avoid invasions of privacy.

¶ 8. The court, however, denied defendant's motion, holding that defendant had no reasonable expectation of privacy from the sky. The court reasoned that, while helicopter flights over one's property in rural Vermont might be infrequent, a reasonable person would still assume that such flights will happen. The court concluded that the police surveillance was not so intrusive as to violate the Vermont Constitution. We disagree and reverse.

¶ 9. On appeal from a denial of a motion to suppress, this Court applies a deferential standard of review to the trial court's findings of fact. *State v. Lawrence*, 2003 VT 68, ¶ 8, 175 Vt. 600, 834 A.2d 10 (mem.). If the findings of fact are not clearly erroneous, we then review the legal issues de novo. *Id.* ¶ 8. Here, defendant does not challenge the findings of the lower court, only its legal conclusions. Our examination of those legal conclusions is therefore nondeferential and plenary. *MacDonough-Webster Lodge No. 26 v. Wells*, 2003 VT 70, ¶ 17, 175 Vt. 382, 834 A.2d 25.

¶ 10. Article 11 of the Vermont Constitution protects the people's right to be free "from unreasonable government intrusions into legitimate expectations of privacy." *State v. Rheaume*, 2005 VT 106, ¶ 8, 179 Vt. 39, 889 A.2d 711 (citing *State v. Kirchoff*,

156 Vt. 1, 6, 587 A.2d 988, 992 (1991)).[1] When government conducts a warrantless search, the law presumes that the intrusion is unreasonable. *State v. Bauder*, 2007 VT 16, ¶ 14 n.4, 181 Vt. 392, 924 A.2d 38. The aerial surveillance at issue in this case was warrantless, and therefore presumptively unreasonable. Thus, the sole issue in this case is whether the aerial surveillance constitutes a search under Article 11 of Vermont's Constitution.

¶ 11. An Article 11 search occurs when the government intrudes into "areas or activities," *State v. Geraw*, 173 Vt. 350, 352, 795 A.2d 1219, 1221 (2002), that are the subject of "'legitimate expectations of privacy.'" *Rheaume*, 2005 VT 106, ¶ 8 (quoting *State v. Welch*, 160 Vt. 70, 76, 624 A.2d 1105, 1108 (1992)). Under Article 11, the question of whether an individual has a legitimate expectation of privacy "'hinges on the essence of underlying constitutional values — including respect for *both* private, subjective expectations and public norms.'" *Id.* (quoting *State v. Blow*, 157 Vt. 513, 517-18, 602 A.2d 552, 555 (1991)). Therefore, in order to invoke Article 11 protection, a person must "'exhibit[] an actual (subjective) expectation of privacy . . . that society is prepared to recognize as reasonable.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)) (internal quotation marks omitted). In other words, Article 11 requires an individual to have "'conveyed an expectation of privacy in such a way that a reasonable person would conclude that he sought to exclude the public.'" *Id.* (quoting *Blow*, 157 Vt. at 517, 602 A.2d at 555). "Whether the steps taken are adequate for this purpose will depend on the specific facts of each case." *Kirchoff*, 156 Vt. at 10, 587 A.2d at 994.

¶ 12. We have often noted the "significance of the home as a repository of heightened privacy expectations," and have deemed those heightened expectations legitimate. *Geraw*, 173 Vt. at 352-53,

---

[1] Article 11 states:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

Vt. Const. ch. I, art. 11.

795 A.2d at 1221; see also *Blow*, 157 Vt. at 518, 602 A.2d at 555. Therefore, although we have disagreed amongst ourselves about the extent to which circumstances may alter the general rule, see *Geraw*, 173 Vt. at 364-68, 795 A.2d at 1229-33 (Skoglund, J., dissenting) (reasoning that because defendant had no legitimate expectation of privacy in consensual conversation with known police officer in defendant's home, the officer's surreptitious recording of the conversation was not a search), government intrusions into the home are searches for purposes of Article 11 even if an individual fails to take affirmative steps to convey his expectation of privacy. See *Blow*, 157 Vt. at 519, 602 A.2d at 556 (holding that police's warrantless recording of conversation between confidential informant and defendant in defendant's home violated Article 11).

¶ 13. A home's curtilage — the "area outside the physical confines of a house into which the 'privacies of life' may extend" — merits "the same constitutional protection from unreasonable searches and seizures as the home itself." *State v. Rogers*, 161 Vt. 236, 241, 638 A.2d 569, 572 (1993) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). However, relying on the principle that there is no invasion of privacy — and therefore no search — when government observes that which is willingly exposed to the public, see *Kirchoff*, 156 Vt. at 10, 587 A.2d at 994, we have consistently held that an individual must take affirmative steps to protect his privacy in his curtilage and his "open fields" — the real property beyond his curtilage. See *State v. Costin*, 168 Vt. 175, 182, 720 A.2d 866, 871 (1998) (holding that video surveillance of the defendant's open fields was not a search because the defendant took no steps to exclude the public from his land); see also *State v. Hall*, 168 Vt. 327, 331, 719 A.2d 435, 438 (1998) (holding that officer's monitoring of the defendant's curtilage from his open fields was not an Article 11 search where the defendant took no steps to prevent public from traversing open fields to reach curtilage or to prevent view of curtilage from open fields); *Rogers*, 161 Vt. at 248-49, 638 A.2d at 576-77 (same). Government does conduct a search when it intrudes onto open fields that a reasonable person would expect to be private. *Kirchoff*, 156 Vt. at 10, 587 A.2d at 994. Fences, gates, and no-trespassing signs generally suffice to apprise a person that the area is private. *Id.*

¶ 14. In this case, we consider whether surveillance from an Army helicopter, circling at 100 feet over defendant's home and

garden for fifteen to thirty minutes for the purpose of detecting contraband, violated his legitimate expectations of privacy. Whether and when aerial surveillance constitutes a search are questions that we have not squarely confronted before. We decide this case solely on Vermont Constitutional grounds, but may be guided by decisions of our sister states and the United States Supreme Court on similar questions.[2] We begin our analysis with a survey of those decisions.

¶ 15. The United States Supreme Court has decided three aerial-surveillance cases; the Court ruled in each that the surveillance at issue was not a search within the meaning of the Fourth Amendment. *Florida v. Riley*, 488 U.S. 445, 448 (1989); *Dow Chem. Co. v. United States*, 476 U.S. 227, 239 (1986); *California v. Ciraolo*, 476 U.S. 207, 214 (1986). For the reasons explained below, we find minimal guidance in these decisions.

¶ 16. In *Dow Chemical*, the Court held that enhanced aerial photography of an industrial complex from an aircraft lawfully operating at altitudes of 12,000 feet, 3,000 feet and 1,200 feet was not a search. 476 U.S. at 239. In *Dow*, the Court likened an industrial complex to an open field, and reasoned that "as such it is open to the view and observation of persons in aircraft lawfully in the public airspace immediately above or sufficiently near the area for the reach of cameras." *Id.* The Court also found it "important that this is *not* an area immediately adjacent to a private home, where privacy expectations are most heightened." *Id.* at 237 n.4. In light of our rejection of the federal open-fields doctrine,[3] and the fact that the aerial surveillance in this case took

---

[2] Defendant's brief suggests that the search violated the Fourth Amendment to the United States Constitution as well as Article 11. Article 11 provides broader protection to individual rights than does the Fourth Amendment. *Costin*, 168 Vt. at 177, 720 A.2d at 868; *State v. Savva*, 159 Vt. 75, 91-92, 616 A.2d 774, 783 (1991); *State v. Wood*, 148 Vt. 479, 482 n.1, 536 A.2d 902, 904 n.1 (1987). Therefore, we decline to examine law enforcement's actions in this case under the federal constitution.

[3] The United States Supreme Court has defined areas of private property beyond the curtilage as "open fields," and has ruled that the Fourth Amendment does not protect these areas to the same extent that it protects the home and its curtilage. *Oliver*, 466 U.S. at 178. Thus, when police officers entered a defendant's field without a warrant, despite obvious no-trespassing signs, the Court found no violation of Fourth Amendment rights. *Id.* In *Kirchoff*, we declined to adopt a similar rule under Article 11. 156 Vt. at 10, 587 A.2d at 994 (holding that "a lawful possessor may claim privacy in 'open fields' under Article 11 of the Vermont Constitution where indicia would lead a reasonable person to conclude that the area is private").

place over defendant's curtilage, we find *Dow Chemical* unpersuasive for purposes of our Article 11 analysis.

¶ 17. In *Ciraolo*, the Court examined "whether naked-eye observation of the [defendant's] curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable."[4] 476 U.S. at 213. The Court found that the defendant's construction of tall fences around his yard "[c]learly . . . met the test of manifesting his own subjective intent and desire to maintain privacy," but found that the defendant could not reasonably have expected that his garden was protected from public or official inspection from the air. *Id.* at 211-14. The Court likened the public airways to public highways, and wrote that "Fourth Amendment protection . . . has never been extended to require . . . officers to shield their eyes when passing by a home on public thoroughfares." *Id.* at 213. Further, the Court reasoned that "the mere fact that an individual has taken measures to restrict some views of his activities" does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id.*

¶ 18. We are not persuaded that the facts of *Ciraolo* make it analogous to this case. In *Ciraolo*, the five-member majority relied heavily on likening airplane travel above the defendant's suburban house at 1,000 feet to "passing by a home on public thoroughfares," *id.* at 213, reasoning that "[i]n an age where private and commercial flight in the public airways is routine, it is unreasonable for [the defendant] to expect that his marijuana plants were constitutionally protected from being observed . . . from an altitude of 1,000 feet." *Id.* at 215. We find the air travel in this case — fifteen to thirty minutes of hovering over defendant's property at altitudes as low as 100 feet — to be distinctly unlike "passing by a home on public thoroughfares." Cf. *Riley*, 488 U.S. at 458-61 (Brennan, J., dissenting) (distinguishing between helicopter surveillance at an altitude of 400 feet and viewing land from a public road).

---

[4] Navigable airspace is airspace above the minimum altitudes of flight prescribed by regulations issued by the Federal Aviation Administration (FAA). 49 U.S.C. § 40102(a)(32) (2003). FAA regulations permit fixed-wing aircraft to be operated at an altitude of 1,000 feet while flying over congested areas and at an altitude of 500 feet above the surface in other areas. Helicopters may be operated at less than the minimums for fixed-wing aircraft "if the operation is conducted without hazard to persons or property on the surface." 14 C.F.R. § 91.119 (2004).

¶ 19. In addition, we find the Court's analysis in *Ciraolo* to lack the consideration for the significance of the home and its curtilage as "repositor[ies] of heightened privacy expectations" that our Article 11 jurisprudence demands. *Geraw*, 173 Vt. at 352-53, 795 A.2d at 1221-22; see also *Rogers*, 161 Vt. at 241, 638 A.2d at 572; *Blow*, 157 Vt. at 518, 602 A.2d at 555; *State v. Brooks*, 157 Vt. 490, 493, 601 A.2d 963, 964-65 (1991). The *Ciraolo* Court gave no weight to the fact that the aerial surveillance targeted a home and its curtilage. This omission is glaring, especially in light of the Court's acknowledgment in *Dow Chemical*, issued on the same day, that "privacy expectations are most heightened" in areas immediately adjacent to homes. *Dow Chemical*, 476 U.S. at 237 n.4; see *Ciraolo*, 476 U.S. at 219 (Powell, J., dissenting) (characterizing the majority's opinion as "curiously at odds with [the Court's] purported reaffirmation of the curtilage doctrine . . . in . . . *Dow Chemical*").

¶ 20. In *Riley*, the Court evaluated an aerial surveillance more analogous to the one at issue in this case; the surveillance was conducted in a helicopter being operated closer to the ground. The defendant lived in a mobile home on five acres of rural property with a greenhouse located ten to twenty feet behind the home. A wire fence surrounded the home and greenhouse, and the property was posted with a "DO NOT ENTER" sign. Based on an anonymous tip that marijuana was being grown on the defendant's property, sheriff's department officers circled twice over the property in a helicopter at an elevation of 400 feet. At the time of the flyover, the greenhouse had two roof panels missing and was open on two sides. Based on what an officer saw from the helicopter, he obtained a warrant, and subsequently found marijuana growing in the greenhouse. The Florida Supreme Court held that the flyover constituted a search under the Fourth Amendment for which a warrant was required.

¶ 21. The United States Supreme Court ruled that *Ciraolo* controlled, and reversed. *Riley*, 488 U.S. at 449, 451. Justice White's opinion for a plurality of four Justices opined that, while the defendant's precautions evinced a subjective expectation of privacy, he "could not reasonably have expected that his greenhouse was protected from public or official observation from a helicopter." *Id.* at 450-51. Justice White cautioned that "it is of obvious importance that the helicopter in this case was *not* violating the law," as it was within navigable airspace. *Id.* at 451.

"We would have a different case," the plurality reasoned, "if flying at [400 feet] had been contrary to law or regulation." *Id.* Cautioning that "not . . . [every] inspection of the curtilage of a house from an aircraft will always pass muster . . . simply because the plane is within the navigable airspace specified by law," *id.*, the plurality also found relevant the fact that the surveillance was relatively nonintrusive. "Neither is there any intimation here," it reasoned, "that the helicopter interfered with [the defendant's] normal use of . . . the curtilage . . . [or that] intimate details connected with the use of the home or curtilage were observed and there was no undue noise, no wind, dust, or threat of injury." *Id.* at 452.

¶ 22. *Riley* was a badly split decision. Justice White announced the judgment of the Court, but his rationale commanded only four votes. The remaining five Justices — including Justice O'Connor, who concurred in the result — discounted the significance of the FAA regulations. *Id.* at 452 (O'Connor, J., concurring) (criticizing the plurality for "rest[ing] the scope of Fourth Amendment protection too heavily on compliance with FAA regulations"); *id.* at 458 (Brennan, J., dissenting) ("It is a curious notion that the reach of the Fourth Amendment can be so largely defined by administrative regulations issued for purposes of flight safety."); *id.* at 467 (Blackmun, J., dissenting) (reasoning that the question of whether there was a Fourth Amendment search "does not depend upon the fact that the helicopter was flying at a lawful altitude under FAA regulations"). The remaining Justices also agreed that a defendant's reasonable expectation of privacy should be evaluated by reference to the frequency of other overflights of similar altitude in the area. *Id.* at 454 (O'Connor, J., concurring) ("[W]e must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that [the defendant's] expectation of privacy from aerial observation was not [reasonable]."); *id.* at 460 (Brennan, J., dissenting) ("The question before us . . . [is] whether public observation of [the defendant's] curtilage was so common-place that [the defendant's] expectation of privacy in his backyard could not be considered reasonable."); *id.* at 467 (Blackmun, J., dissenting) ("[T]he reasonableness of [the defendant's] expectation depends, in large measure, on the frequency of nonpolice helicopter flights at an altitude of 400 feet."). In addition, the remaining five Justices rejected the analogy Justice White drew between

surveillance from a helicopter and ground-level observations from roads or sidewalks. As Justice O'Connor reasoned, "individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas." *Id.* at 454.

¶ 23. Since the rulings in *Dow Chemical, Ciraolo* and *Riley*, and despite the fact that all the *Riley* opinions engaged in a multi-factored analysis, some state courts have relied solely on the legality of a helicopter's position in public airspace to determine whether the aerial surveillance at issue was a search. See, e.g., *State v. Ainsworth*, 801 P.2d 749, 750-52 (Or. 1990) (upholding surveillance from helicopter solely on basis of lawfulness of officer's vantage point, where testimony as to altitude ranged from fifteen feet above the tree line to "pretty close to four or five hundred feet"). Because FAA regulations allow helicopters to fly at any altitude "if the operation is conducted *without hazard to persons or property on the surface,*" 14 C.F.R. § 91.119 (emphasis added), the inevitable result of this reasoning — in the absence of more restrictive state aviation laws — is that the *dangerousness* of police surveillance may become the yardstick by which consti-tutional privacy protection is measured. As a case on point, in *Commonwealth v. Oglialoro*, the Supreme Court of Pennsylvania reasoned that by using a transparent or translucent roof on a pole barn located within the curtilage of the defendant's house, the defendant "knowingly exposed his [marijuana plants] to persons lawfully operating aircraft over his property who might decide to take a look." 579 A.2d 1288, 1292 (Pa. 1990). The court thus rejected the suggestion that any expectation of privacy attached in such situations. *Id.* However, the court held that the police-surveillance flight, which involved a helicopter hovering fifty feet above the barn for fifteen seconds, had violated FAA regulations and thus the Fourth Amendment because it "represented a hazard to persons and property on the ground." *Id.* at 1294.[5]

¶ 24. Other state courts have developed a more nuanced ap-proach to privacy protection. Some courts adopt the reasoning of Justice White's plurality in *Riley* and consider the legality and

---

[5] In light of its reasoning, we find the court's protestation that it did "not view the FAA regulations as defining the reach of the Fourth Amendment" to be totally inexplicable. *Oglialoro*, 579 A.2d at 1294.

intrusiveness of the surveillance flight. See *Henderson v. People*, 879 P.2d 383, 389-90 (Colo. 1994) (upholding a surveillance where a helicopter made five passes above the defendant's home over the course of several minutes at or above 500 feet, where there was little evidence of noise, wind, dust, threat of injury or interference with the defendant's use of his curtilage, and where there was no indication that the defendant's neighbors felt compelled to exit their houses to observe the commotion); *Rowell v. State*, 544 So. 2d 1089, 1093 (Fla. Dist. Ct. App. 1989) (upholding a surveillance where an airplane was operating at unknown altitude but where there was no evidence of illegality or "obtrusive[ness]"); *State v. Rodal*, 985 P.2d 863, 867 (Or. Ct. App. 1999) (upholding a surveillance where a military helicopter made two passes over the defendant's home at an altitude of 600 feet because the helicopter was being operated in a lawful and unintrusive manner); *State v. Wilson*, 988 P.2d 463, 465-66 (Wash. Ct. App. 1999) (upholding a surveillance where an airplane was operating at 500 feet over the defendant's rural residence and where no evidence that "visual enhancement equipment" made the method of viewing intrusive).

¶ 25. Still other state courts attempt to give effect to all of the *Riley* opinions by evaluating legality, intrusiveness, and the frequency of flight at the altitude at which the surveillance took place. In *People v. Pollock*, for example, the court acknowledged the legality of a helicopter's position at the altitude of 200 feet, but struck down the aerial surveillance based on the infrequency of helicopter flights at 200 feet and the intrusiveness of the "excessive noise" it created as it circled the targeted area. 796 P.2d 63, 64 (Colo. Ct. App. 1990). In *People v. McKim*, the court upheld surveillance conducted from a helicopter operating at 400 feet where there was "no evidence . . . that the helicopter surveillance over [the] defendant's residence interfered with [the] defendant's use of his property, or revealed intimate details connected with the use of his home or curtilage, or created any undue noise, wind, dust, or threat of injury." 263 Cal. Rptr. 21, 25 (Ct. App. 1989).

¶ 26. A remaining group of state courts rely on a multitude of factors of their own articulation. See, e.g., *Commonwealth v. One 1985 Ford Thunderbird Auto.*, 624 N.E.2d 547, 550-51 (Mass. 1993) (upholding surveillance where helicopter was operating at altitudes of 700 feet and above after considering (1) "whether the police had a lawful right to be where they were," (2) "whether the public

had access to, or might be expected to be in, the area from which the surveillance was undertaken," (3) "the nature of the intrusion," and (4) "the character of the area (or object) which was the subject of the surveillance"). And, in the view of at least one state court, the legality of the surveillance can depend, in part, on whether the aerial observation was "part of [an] investigative operation" or was instead "wholly fortuitous." *State v. Vogel*, 428 N.W.2d 272, 274 (S.D. 1988) (upholding observation made from an airplane operating at an altitude of 500 feet because of the legality of the "flight path" as well as its fortuitousness); cf. *Ainsworth*, 801 P.2d at 753 ("While it is true that absence of a purposive intrusion into a protected area is some indication that no search has occurred, it does not follow that purposive police action, alone, transforms a permissible observation into an unconstitutional search."). But see *Thunderbird*, 624 N.E.2d at 551 ("'[I]f there is some justification for concentrating a surveillance on a particular place, as opposed to random investigation to discover criminal activity, that factor is weighed in the balance and contributes to justification for the surveillance.'" (quoting *United States v. Allen*, 633 F.2d 1282, 1290 (9th Cir. 1980)).

¶ 27. It is our opinion that many of the factors relied on by our sister states and the Supreme Court in *Riley* are relevant to evaluating the legitimacy of privacy expectations under Article 11 in the context of the aerial surveillance at issue in this case. The legitimacy of an individual's expectation of privacy is a broad question of "'private, subjective expectations and public norms.'" *Rheaume*, 2005 VT 106, ¶ 8 (quoting *Blow*, 157 Vt. at 517-18, 602 A.2d at 555). When we declined to adopt the federal open-fields doctrine in *Kirchoff*, 156 Vt. at 10, 587 A.2d at 994, we recognized that Vermonters normally expect their property to remain private when posted as such. We have also recognized that Vermonters normally have high expectations of privacy in and around their homes. See, e.g., *Geraw*, 173 Vt. at 352-53, 795 A.2d at 1221-22; *Blow*, 157 Vt. at 518-19, 602 A.2d at 556; *Brooks*, 157 Vt. at 493-94, 601 A.2d at 964-65. Therefore, we think it is also likely that Vermonters expect — at least at a private, rural residence on posted land — that they will be free from intrusions that interrupt their use of their property, expose their intimate activities, or create undue noise, wind, or dust. Cf. *In re Cohen*, 161 Vt. 432, 436, 640 A.2d 34, 37 (1994) (contemplating that an aircraft

might fly "low enough to violate [an individual's] reasonable expectation of privacy").

¶ 28. We are also persuaded that the legality of the altitude at which aerial surveillance takes place can be relevant to the determination of whether an individual has a legitimate expectation of privacy in his real property. Indeed, the citizens of Vermont likely expect that law enforcement personnel as well as other air travelers will abide by safety rules and other applicable laws and regulations when flying over their homes. However, it simply does not follow that whether a member of the public is abiding by the law in occupying a particular spot in the public airspace is an adequate test of whether government surveillance from that same spot is constitutional. Cf. *Riley*, 488 U.S. at 453 (O'Connor, J., concurring) ("[T]here is no reason to assume that compliance with FAA regulations alone determines whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.") (quotation omitted). Therefore, we disagree with those courts that would use the legality of an aircraft's position alone to evaluate the constitutionality of the surveillance conducted aboard it.

¶ 29. In any event, at least on the facts of this case, no one factor need act as a litmus test of constitutionality, because the surveillance at issue here was a patent violation of defendant's legitimate expectations of privacy. We understand that our abstention from drawing a bright line that makes the legality or frequency of flights at certain altitudes a quick index to the constitutionality of aerial surveillance gives limited guidance to trial courts and law enforcement personnel in the context of other cases. But we are not presented with other cases; we are presented only with this case. In this case, defendant has demonstrated that he has a subjective expectation of privacy in his back yard. He has taken precautions to exclude others from his back yard by posting his land and by communicating to a local forest official that he did not want people trespassing on his land. Under *Kirchoff*, these measures were clearly adequate. 156 Vt. at 10, 587 A.2d at 994 (fences, gates, and no-trespassing signs generally suffice to apprise a person that an area is private). It is

of no moment that defendant could not effectively post his sky.[6] For we agree with Justice O'Connor that "even individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas," *Riley*, 488 U.S. at 454 (O'Connor, J., concurring), and Article 11 does not require them to try. See *State v. Morris*, 165 Vt. 111, 119, 680 A.2d 90, 96 (1996) (Article 11 "does not require the residents of this state to employ extraordinary . . . means" to maintain their constitutional privacy rights.). Technology has produced many and varied means of observation and surveillance. But the fact that something can be done does not make the doing of it constitutional.[7] Furthermore, defendant's subjective expectation that he would be free from this intrusion — an aerial surveillance that targeted defendant's home and curtilage, was highly intrusive, and was in violation of laws governing helicopter flight — was legitimate.

¶ 30. Several sets of governmental regulations lend support to our analysis of the legitimacy of defendant's expectation of privacy. In addition to the relevant FAA regulations, other federal law authorizes the National Guard to assist in state "counter-drug activities," 32 U.S.C. § 112, and National Guard regulations govern those activities. The National Guard regulations require all aerial counter-drug operations to adhere to specific altitude restrictions.

---

[6] We reject the argument that a tidy analogy may be drawn between surveillance from a helicopter and ground-level observations "in terms of whether expectations of privacy from such vantage points" are legitimate. *Riley*, 488 U.S. at 454 (O'Connor, J., concurring). Vantage point has always been an important consideration in our evaluation of privacy protection. See *Costin*, 168 Vt. at 178-79, 720 A.2d at 868-69 (noting that the "controlling significance of the place of observation" in Article 11 cases is made clear by *Brooks*, 157 Vt. at 493-94, 601 A.2d at 964; *Blow*, 157 Vt. at 519, 602 A.2d at 556; and *Rogers*, 161 Vt. at 248, 638 A.2d at 576). And we think it important that "[p]ublic roads, even those less traveled by, are clearly demarked public thoroughfares." *Riley*, 488 U.S. at 454 (O'Connor, J., concurring). Vermonters can easily protect themselves from unwanted intrusions from such thoroughfares.

[7] See *Kyllo v. United States*, 533 U.S. 27, 40 (2001) (holding that the use of a thermal-imaging device aimed at a private home from a public street constituted a search within the meaning of the Fourth Amendment for which a warrant was required). But see *Dow Chem.*, 476 U.S. at 237 n.4 (upholding enhanced aerial photography of an industrial complex, finding it "important that this is *not* an area immediately adjacent to a private home, where privacy expectations are most heightened").

National Guard Training Circular (NGTC) 1-500, Counterdrug Aviation, § 2-10. The altitude-restriction regulation begins with the following admonition: "Altitude restrictions exist for the safety of the flight crew, passengers, aircraft, persons and property on the ground. Furthermore, restrictions exist in [counter-drug operations] to protect the rights guaranteed under the Constitution." *Id.* In relevant part, the regulations require that all National Guard aircraft performing counter-drug missions "will maintain a minimum altitude of 500 feet AGL [above ground level]," with exceptions not relevant to this case. *Id.* §§ 2-10, 3-18(f). A mission may be conducted below 500 feet to verify an eradication or reconnaissance objective if "descent is no lower than 200 feet AGL." *Id.* § 2-10(b)(4). "Upon verification . . . the pilot must return to a minimum of 500 ft AGL. Sustained flight below 500 ft AGL is not authorized." *Id.* § 2-10(b)(5).

¶ 31. There are also Vermont statutes governing aeronautics. Specifically, 5 V.S.A. § 421 prescribes minimum altitudes for the operation of aircraft. Section 421(3) requires that all aircraft must maintain "an altitude of 500 feet above the surface, except over open water or sparsely populated areas. In this event, the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure." *Id.* The term "aircraft" includes helicopters. 5 V.S.A. § 202(6).[8] Section 421(1) provides that all aircraft, wherever operated, must maintain "an altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface." *Id.* This section is identical to the FAA regulation at issue in *Oglialoro,* 579 A.2d at 1293 n.5 (quoting 14 C.F.R. § 91.79 (1988), recodified at 14 C.F.R. § 91.119 (2004)). Although the FAA regulations allow helicopters to fly at altitudes below 500 feet, they too insist on this basic emergency-landing safety rule.

¶ 32. As discussed, although they are plainly not dispositive of the Article 11 issue, these FAA and National Guard regulations and Vermont statutes do assist us in determining where a person's legitimate expectation of privacy ends. However, as noted, because expectations of privacy are not simply a function of the safety concerns of state and federal governments, we also look to the intrusiveness of the surveillance.

---

[8] Although the Legislature has given the Agency of Transportation authority to make special rules for helicopters, to date, it has not done so. 5 V.S.A. § 426.

¶ 33. The trial court in this case ruled that:

> [w]hile it may not be a common occurrence to have helicopters fly over one's property in rural Vermont, it is not the frequency of such flights that matters but whether it is reasonable to assume they will not happen. It is always a possibility that a helicopter, whether a rescue helicopter, a medical organ transport helicopter, a news helicopter, or even a hot air balloon may fly over one's property at a low altitude. Here, as in *Riley*, because these flights can legally occur over Defendant's property, law enforcement surveillance flights may also do so.

The court misstated the "legality" of the flyover in this case and understated the intrusive nature of the surveillance, which admittedly targeted defendant. The helicopter, while circling 100 feet over defendant's home, was being operated contrary to law and regulation. Nor, as discussed above, was the nature of the intrusion in this case remotely comparable to that presented by a hot-air balloon or an organ-transport or rescue helicopter passing by overhead. "Travelers on commercial flights, as well as private planes . . . normally obtain at most a fleeting, anonymous, and nondiscriminating glimpse of the landscape and buildings over which they pass." *Ciraolo*, 476 U.S. at 223 (Powell, J., dissenting).

¶ 34. Witnesses observed that the helicopter surveillance in this case was "so long and so low and so loud." The occupants of the helicopter, while hovering over defendant's property for up to thirty minutes, were positioned to examine the entire curtilage and to observe any activities taking place there. Such surveillance of an area "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened," was extremely intrusive. *Ciraolo*, 476 U.S. at 213. The occupants were law-enforcement officers, trained in the identification of marijuana, who conducted an overflight at illegal altitudes solely for the purpose of discovering evidence of crime within a private enclave into which they were constitutionally forbidden to intrude at ground level without a warrant. The actions of law enforcement — flying only 100 feet above the ground for up to thirty minutes over a hillside home — were an unreasonable intrusion of privacy that triggers constitutional protection.

¶ 35. The dissent argues that our decision is too broad. However, it is in part because we are obligated to write narrowly that we refrain from relying exclusively on the altitude of this flight to determine whether it is a search within the meaning of our Constitution. It is not necessary that we reach that question on the facts of this case. Our role is not simply to "serve the public interest," *post*, ¶ 43, but to do so by ruling on only those issues necessary to the question presented. The essential question in this case is not as broad as "when *aerial surveillance* will be considered a search." *Id.* (emphasis added). The essential question in this case is, rather, whether *this* aerial surveillance was a search. We have answered that question in the affirmative based on the facts before us. Indeed, this is a narrower rule of decision than one that would constitutionalize altitude limits.

¶ 36. The overriding function of Article 11 is to protect personal privacy and dignity against unwarranted intrusion by the state. It requires that the state temper its efforts to apprehend criminals with a concern for the impact of its methods on our fundamental liberties. Principles established in cases such as this delineate the extent to which official intrusion into the privacy of any citizen will be constitutionally permissible.

¶ 37. In *Johnson v. United States*, the Supreme Court wrote that the Fourth Amendment reflects a choice that our society should be one in which citizens "dwell in reasonable security and freedom from surveillance." 333 U.S. 10, 14 (1948). With technological advances in surveillance techniques, the privacy-protection question is no longer whether police have physically invaded a constitutionally protected area.[9] Rather, the inquiry is whether the surveillance invaded a constitutionally protected legitimate expectation of privacy. In this case, the targeted, low-level helicopter surveillance by the police of activities in an enclosed backyard is not consistent with that expectation — not without a warrant.

_____

[9] As was said more than six decades ago: "[T]he search of one's home or office no longer requires physical entry, for science has brought forth far more effective devices for the invasion of a person's privacy than the direct and obvious methods of oppression which were detested by our forebears and which inspired the Fourth Amendment." *Goldman v. United States*, 316 U.S. 129, 139 (1942) (Murphy, J., dissenting).

¶ 38. The dissent acknowledges that the helicopter observation at issue in this case violated defendant's rights. However, the dissent creates a factual dispute not argued by the parties — whether the law-enforcement personnel made an observation of defendant's activities before operating the helicopter at illegal altitudes — to avoid providing a remedy for that violation. We find the dissent's speculation highly unpersuasive. In the application for a search warrant and in testimony at court, the officers testified that they were at an altitude of 500 feet at all times. They were obviously implying that their observation and identification of marijuana occurred at that altitude. However, the trial court did not find their testimony credible. Therefore, there is no reason to remand on this point.

¶ 39. It may be easy to forget, especially in view of current concerns over drug abuse in our society, that the scope of Article 11's protection "does not turn on whether the activity disclosed by a search is illegal or innocuous." *Riley*, 488 U.S. at 463 (Brennan, J., dissenting). The interest protected by Article 11, like the Fourth Amendment, "is the expectation of the ordinary citizen, who has never engaged in illegal conduct in his life." *United States v. White*, 401 U.S. 745, 790 (1971) (Harlan, J., dissenting); see *Savva*, 159 Vt. at 86, 616 A.2d at 780 (reasoning that the warrant requirement, rather than after-the-fact challenges by criminal defendants, protects the rights of everyone — law-abiding as well as criminal). In his dissent in *White*, Justice Harlan reasoned that the scope of constitutional protection must reflect "the impact of a practice on the sense of security that is the true concern of the [constitution's] protection of privacy." 401 U.S. at 788 n.24. We agree. We protect defendant's marijuana plots against such surveillance so that law-abiding citizens may relax in their backyards, enjoying a sense of security that they are free from unreasonable surveillance.

¶ 40. The aerial surveillance in this case was a warrantless search forbidden by the Vermont Constitution. The warrant authorizing the subsequent search of defendant's premises for marijuana plants was obtained solely on the basis of the aerial observations. The evidence seized upon executing the warrant should therefore have been excluded from defendant's trial. Since the error was clearly prejudicial, his conviction must be overturned.

¶ 41. Because this disposes of the case, we decline to reach the medical-necessity issue.

*Reversed.*

¶ 42. **Dooley, J.,** concurring in part and dissenting in part. I agree with the opening paragraph of the majority decision that "Vermont citizens have a constitutional right to privacy that ascends into the airspace above their homes and property" and that the "aerial surveillance in this case violated that constitutionally protected privacy right." *Ante*, ¶ 1. Thus, I concur in the majority's essential holding. But I cannot concur in the open-ended rationale or in the immediate consequence of that holding. Thus, I dissent in part.

¶ 43. As the majority acknowledges, this is a case of first impression, addressing a very important constitutional question. In these circumstances, it is critical that we write narrowly and provide as much predictability to citizens and law enforcement as possible. The essential question is when aerial surveillance will be considered a search. We do not serve the public interest if the answer to that seemingly simple question can be determined only in hindsight, after evaluating myriad factors. The majority states that it gives a clear answer by relying on the decisions "of our sister states and the United States Supreme Court." *Ante*, ¶ 14. I fail to see how the majority decision offers that guidance, and, as I discuss below, the majority certainly does not rely on the decisions from other courts. In fact, it rejects virtually all other decisions on the question presented to us.

¶ 44. Acknowledging that its decision gives limited guidance to trial courts and law enforcement personnel and — I would add citizens — in the use of their property, the majority states that "no one factor need act as a litmus test of constitutionality." *Ante*, ¶ 29. Then, in the course of the opinion, the majority goes on to cite almost a dozen separate factors: (1) the aerial surveillance took place over defendant's curtilage, *id.* ¶¶ 16, 34; (2) the helicopter hovered for fifteen to thirty minutes, *id.* ¶ 18; (3) the helicopter hovered at an altitude of 100 feet, *id.*; (4) the altitude was illegal, *id.* ¶¶ 30-33; (5) the open land was posted, *id.* ¶ 27; (6) the officers were constitutionally forbidden to intrude at ground level, *id.* ¶ 33; (7) the helicopter created "undue noise, wind, or dust," *id.* ¶ 27; (8) the surveillance was long, low and loud, *id.* ¶ 34; (9) the flyover was a "hazard to persons and

property," *id.* ¶ 31; (10) the flyover "targeted defendant," *id.* ¶ 33; and (11) the flyover was conducted by trained law-enforcement officers in order to discover evidence of a crime, *id.* ¶ 34. The opinion makes no attempt to explain which of these factors are essential to its decision. It is not even clear under which circumstances the majority would find that aerial surveillance by law-enforcement officers is not a search.

¶ 45. The approach of the majority should be compared to those of other state courts. The leading cases are *State v. Ainsworth*, 801 P.2d 749 (Or. 1990); *Commonwealth v. Oglialoro*, 579 A.2d 1288 (Pa. 1990); and *Henderson v. People*, 879 P.2d 383 (Colo. 1994). The facts of *Ainsworth* are very similar to those in this case, except that, in that case, the helicopter was in a lawful location at the time of the observation of the marijuana plants. The court found this fact determinative, holding that, if the flyover did not violate "any common law or statutory rights of defendants, nor any rules, regulations, or other legal restrictions," and, therefore, if the helicopter was in a lawful place, then the flyover was not a search under the Oregon Constitution. *Ainsworth*, 801 P.2d at 752. If a privacy intrusion was "purposive" as part of a criminal investigation aimed at the defendants, the court reasoned that this fact alone did not transform "a permissible observation into an unconstitutional search." *Id.* at 753.

¶ 46. The court responded directly to arguments adopted by the majority here:

> The state, defendants, and each of the Court of Appeals' opinions in this case suggest that there are many factors to take into account in determining whether aerial observation constitutes a search under Article I, Section 9. Although they vary in terms of the number of elements to be considered and the emphasis to be placed on each element, all are unworkable as guidelines for law enforcement activities.

*Id.* at 754; see also *State v. Wilson*, 988 P.2d 463, 465 (Wash. Ct. App. 1999) (fixed-wing-aircraft overfly at above 500 feet, the FAA altitude limit, is not a search under the Washington Constitution).

¶ 47. The decision in *Oglialoro* is consistent with that in *Ainsworth*. In *Oglialoro*, the helicopter flew over a barn with a transparent roof, under which marijuana plants were growing. The court held that: "[a]s long as the police have the right to be where

they are, and the activity is clear and visible, the fact that they are peering into curtilage is of no significance." 579 A.2d at 1292. The court found that the helicopter hovered at fifty feet above the barn in order to determine whether the plants in question were marijuana plants and that flying at that altitude violated federal law because it was "a hazard to persons and property on the ground." *Id.* at 1294. Thus, the court found that the surveillance was a search. *Id.*

¶ 48. *Henderson* adopted a virtually identical analysis. In that case, the helicopter flew over a shed behind the defendant's house at an altitude of 500 to 700 feet, and in the shed, the officer in the helicopter observed plants that he identified as marijuana. The court first analyzed the case under the Fourth Amendment, relying on the plurality analysis in *Florida v. Riley*, 488 U.S. 445 (1988), and holding that the critical issue in the case was not the "number of times the helicopter passed over," "the fact it was a helicopter," or "how often . . . aircraft passed over the residence during the course of a year," but instead "the fact that the marijuana was in plain view to anyone legally viewing the shed from the helicopter." *Henderson*, 879 P.2d at 389. The court considered one other factor: that there was a limited degree of intrusiveness because of the limited duration, the altitude of the flight, and "little evidence of the noise, wind, dust, threat of injury, or interference with the use of the curtilage." *Id.* at 390. Under Article II, Section 7 of the Colorado Constitution, because observation of what was plainly visible was not a search, the court held that observation of the curtilage from a lawful vantage point outside the curtilage was not a search. *Id.* at 390-91.

¶ 49. The majority claims that other decisions are "more nuanced," *ante*, ¶ 24, or routinely consider a "multitude of factors," *ante*, ¶ 26. To the extent this characterization is accurate, I do not believe that any of the post-*Riley* decisions support the majority's multi-factored, open-ended analysis. The main example of consideration of a multitude of factors cited by the majority is *Commonwealth v. One 1985 Ford Thunderbird Automobile*, 624 N.E.2d 547 (Mass. 1993), decided under the Massachusetts Constitution. The decision is based on only two factors: the low altitude at which the helicopter flew and the fact that the flyover was not based on random surveillance, but instead on a detailed tip. *Id.* at 551. Ironically, the latter factor is not one of those cited by the majority here; indeed, the majority instead cites the

targeted nature of the flyover as a factor showing that it was a search.

¶ 50. I have already covered most of the cases that the majority sees as applying a "more nuanced approach." I would add that *State v. Rodal*, 985 P.2d 863, 867 (Or. Ct. App. 1999), is an intermediate court of appeals decision that must, and does, follow the Oregon Supreme Court decision in *Ainsworth*. See *id.*

¶ 51. In sum, I would reverse and remand on narrower and more specific grounds. First and foremost, we should acknowledge that a naked-eye observation[10] from a properly conducted flyover, even if over a dwelling and curtilage, is not a search under Article 11. This is the holding of all of our precedents. Indeed, only a small handful of court decisions have ever found aerial surveillance to be a search and then have done so only in particularly intrusive situations.

¶ 52. Second, like the courts in *Ainsworth, Henderson,* and *Oglialoro,* I would condense the test and look essentially at only one factor: whether the observation was conducted from a lawful vantage point and was thus lacking in extraordinary intrusiveness. This factor is entirely consistent with our prior Article 11 analysis. In *State v. Rogers,* 161 Vt. 236, 248-49, 638 A.2d 569, 576 (1993), we held that police observation of marijuana growing in defendant's garden within the curtilage is not a search if the officer is standing in a place from which observation is lawful, for example, in an unposted "open field." Application of that principle here means that observation from a helicopter that is lawfully flying over defendant's property is generally not a search. Defendant noted the consistency of this factor with our Article 11 jurisprudence in arguing that "the [*Riley*] plurality's rationale makes a better fit with this Court's Article 11 decisions than with the Fourth Amendment."

¶ 53. Although I would also consider intrusiveness to respond to circumstances like those in *Oglialoro* where the actions of the helicopter involved extraordinary intrusiveness, this addition has no bearing on the facts of this case, because the applicable law requires that the helicopter stay at least 500 feet above the

---

[10] Although the majority does not mention the issue explicitly, I would leave to another day the issue of enhanced observation by binoculars or more advanced technology. See *State v. Rogers,* 161 Vt. 236, 245-46, 638 A.2d 569, 574-75 (1993) (leaving open the question of whether observation of the curtilage from a lawful vantage point is a search if aided by binoculars or technology).

ground. I agree with defendant that this altitude is required by statute and by the regulations of the MERT program.

¶ 54. The majority objects that the altitude limits protect the safety, rather than privacy, interests of the citizenry. This is partially correct, but beside the point. Even if made from a lawful vantage point, an observation of objects or activities is just as intrusive as one from an unlawful point, irrespective of what makes the point of observation lawful or unlawful. The point is that the owner of the curtilage cannot consider to be unexpected an observation from a lawful vantage point and, therefore, has no reasonable expectation of privacy.

¶ 55. Applying this standard to the present situation, I acknowledge that it would have been better in this case if the trial court had determined whether the marijuana plants were within defendant's curtilage, because such a question is a mixed question of fact and law on which the trial court's determination is entitled to some deference. See *Rogers*, 161 Vt. at 241, 638 A.2d at 572. The evidence on this point comes from the officer's affidavit that was filed with the information and that contains the result of the search warrant execution: that "the first location was along his garden fence" where twelve marijuana plants were found growing, that defendant brought the officer "to a location just south of the garden where 24 marijuana plants were . . . growing," and that defendant finally showed the officer a lot "located south/east of the garden where 13 plant[s] were . . . growing." During the flyover, the officer observed that the plants were "approximately 100 feet from the residence." Although consistent with its generally vague approach, the majority is not clear on this point but appears to have concluded that the plants were in the curtilage. I think that is a reasonable conclusion. Defendant has generally argued that the plants were within the curtilage, and the State has not directly disputed that characterization. The facts here on this point are very similar to those in *Rogers*, where we upheld a trial court conclusion that the plants were within the curtilage. See *id.* at 241-43, 638 A.2d at 572-73.

¶ 56. I would not rule in this case on the standard for aerial observations of open fields that are posted on the ground. There are arguments on both sides of this question that are only superficially explored in the briefing. The trial court specifically refused to find whether the officer who made the aerial observation was aware of the posting. Again, because of the breadth and

lack of specificity in the majority opinion, it is impossible to determine whether that opinion purports to address this question. For now, I would limit this decision to observation of the dwelling and curtilage.

¶ 57. This leads me to the second ground of disagreement with the majority decision. The majority has ruled that the warrant "was obtained solely on the basis of the aerial observations," *ante*, ¶ 40, and reversed defendant's conviction as a result. Since the majority refuses to specify which part of the observations constituted a search under Article 11, that ruling is logical, but it also an example of why the majority's overbroad approach is inconsistent with the applicable law.

¶ 58. Answering the question about whether state conduct violated defendant's constitutional rights does not, in itself, decide what the remedy for the violation should be. The remedy invoked here is to suppress the marijuana evidence. This remedy may be invoked, however, only if there is a causal connection between the constitutional violation and the obtaining of the evidence. See *Segura v. United States*, 468 U.S. 796, 804-05 (1984) (explaining application of causation, or independent-source doctrine, in Fourth Amendment cases); see also *United States v. Ramirez*, 523 U.S. 65, 72 n.3 (1998) (application of the exclusionary rule depends on the existence of a "sufficient causal relationship" between the unlawful conduct and the discovery of the evidence). The exclusionary rule prohibits the introduction of evidence directly resulting from unconstitutional conduct and also "prohibits the introduction of derivative evidence . . . that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); accord *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). The exclusionary rule does not apply to evidence that is obtained through an independent source. See *Murray*, 487 U.S. at 538-39. The exception is designed to prevent too much evidence from being excluded, because "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error." *Nix v. Williams*, 467 U.S. 431, 443 (1984). We have recognized the independent-source doctrine in *State v. Phillips*,

140 Vt. 210, 218, 436 A.2d 746, 750-51 (1981), and *State v. Dupaw*, 134 Vt. 451, 454, 365 A.2d 967, 968 (1976) (stating that the exclusionary rule applies only insofar as " 'knowledge gained by the Government's own wrong cannot be used by it.' ") (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)).

¶ 59. A good example of the importance of the causation requirement comes from *State v. Rodal*, where the defendant argued that photographs taken from a helicopter with a telephoto lens turned a permissible flyover into a search. The court answered that the officer observed the marijuana plants before he photographed them, and that his observation, apart from the photographs, was sufficient to allow officers on the ground to locate the plants. *Rodal*, 985 P.2d at 867. Thus, the naked-eye observation was an independent source of the identification of the marijuana. See also *State v. Marolda*, 927 A.2d 154, 164 (N.J. Super. Ct. App. Div. 2007) (under New Jersey Constitution, low flight over "the residence and curtilage was preparatory and incidental to location and observation of cornfields, which are not constitutionally protected").

¶ 60. The trial court in the instant case found that "the helicopter was flying at less than 500 feet at various times during the flight in question, and at times as low as 100 feet above the ground." Because the court held that there was no constitutional violation, the court did not, however, relate the altitude of the helicopter to the observation of the marijuana. The majority has not attempted to clarify the point. Indeed, because the majority will not explain which conduct made the flyover a search, it is impossible to determine causation as required.

¶ 61. The record indicates that the officer understood that he was required to make a naked-eye observation of marijuana from above 500 feet. If he made such an observation before the helicopter came below that altitude over defendant's house and curtilage, there may have been an independent and lawful search that obtained the information defendant is seeking to suppress. I would remand for determination of when the crucial observation was made rather than holding the search to be constitutionally defective and reversing defendant's conviction. It may well be that the constitutional violation and the observation of the marijuana are inextricably intertwined, but the majority has acted prematurely in so ruling.

¶ 62. The majority has answered that the State never put causation in issue and therefore that we must act, as a matter of law, as if the question of causation were resolved in defendant's favor. In fact, the State never had the burden to put causation in issue. In this case, since the State's position was that the officers acted lawfully, the State had no reason or ability to speculate on how the officers' conduct might be found to be unlawful and how causation would be established. The fact is that no court, not this Court or the district court, has found that the constitutional violation caused the observation of the marijuana, and defendant has therefore escaped entirely his burden of proof.

¶ 63. In summary, I carry no brief for aerial surveillance as part of a marijuana eradication program. There is a legitimate policy debate about whether such surveillance is a good use of limited law enforcement resources, but that debate should be resolved as a matter of policy, not constitutional law. My disagreement with the majority lies in its assertion that it has written "narrowly" by refraining from ruling based on the altitude of the helicopter and by relying instead upon the totality of the circumstances. By relying on a multitude of factors, most of which are irrelevant to whether a search occurred here, and by refusing to assign any particular weight to any factor, the majority has painted with the broadest brush imaginable, far broader than any other court in the land. Every factor the majority introduces into the analysis makes the grounds for its decision broader. This is not narrow decision making. Increasingly, we are using rationales in Article 11 cases that require the intervention of this Court before it can be determined whether law enforcement conduct was lawful, because no law-enforcement officer, citizen, or trial court judge could ever predict what we will ultimately decide. Professor LaFave has explained the problem with an approach like the majority's as follows:

> The basic premise is that Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms which are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the

sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field.

If the rules are impossible of application by the police, the result may be the sustaining of motions to suppress on Fourth Amendment grounds with some regularity, but this can hardly be taken as proof that the people are secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Rather, that security can only be realized if the police are acting under a set of rules which, in most instances, make it possible to reach a correct determination *beforehand* as to whether an invasion of privacy is justified in the interest of law enforcement. In short, we must resist the understandable temptation to be responsive to every relevant shading of every relevant variation of every relevant complexity lest we end up with a [F]ourth [A]mendment with all of the character and consistency of a Rorschach blot.

2 W. LaFave, Search and Seizure § 5.2(c), at 448-49 (2d ed. 1987) (footnotes and internal quotations omitted). The rule announced by the majority today falls into precisely the trap Professor LaFave outlines. No one, be it the trial courts, law-enforcement officers, or the citizens of this state will consistently be able "to reach a correct determination *beforehand* as to whether an invasion of privacy is justified" under similar circumstances. *Id.* I do not think we administer justice with such an approach, and we hardly guarantee to "the people" that they will be secure in "their persons, houses, papers, and effects, against unreasonable searches and seizures." *Id.* (quotations omitted).

¶ 64. I would reverse and remand, but on a much narrower rationale, fully consistent with the precedents from this Court and courts in other jurisdictions, thus giving better guidance to trial courts, ordinary citizens, and law enforcement. Thus, although I concur that the helicopter observation violated defendant's rights, I cannot approve of the majority's mode of constitutional analysis or of the remedy it imposes.